UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

———————————————————
                                        :
LATOYA ISAAC,                           :
                                        :
                        Plaintiff,      :          Civil No. 3:12-1120
                                        :
        v.                              :
                                        :          (Judge Kosik)
CAROLYN W. COLVIN, ACTING               :
COMMISSIONER OF SOCIAL                  :
SECURITY                                :                    **FILED**
                                        :                   **SCRANTON**
                        Defendant.      :
                                        :                  MAY 1 4 2014
———————————————————

**MEMORANDUM**                                      PER_____
                                                     DEPUTY CLERK

## I. BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of

Social Security ("Commissioner"), denying Plaintiff Latoya Isaac's claim for supplemental

security income ("SSI") benefits.

Isaac applied for disability insurance benefits ("DIB") and SSI benefits under Title II and

Title XVI, on June 29, 2009. (Tr. 163-75.)[1] In both applications, Isaac's alleged onset date was

August 15, 2007. (Id.) These claims were denied, and the alleged onset date was subsequently

amended to January 9, 2009, the day after her previous unfavorable decision.[2] (Tr. 35, 80-91,

———————————————————

[1] References to "Tr. __" are to pages of the administrative record filed by the Defendant as part
of the Answer (Docs. 6, 7) on August 8, 2012.

[2] Isaac was last insured for Title II disability benefits September 30, 2008. (Tr. 184.) Therefore,
with an amended alleged onset date of January 9, 2009, Isaac's claim is only for SSI benefits.

248.)

Isaac requested a hearing before the Administrative Law Judge ("ALJ") Office of Disability Adjudication and Review of the Social Security Administration, and one was held on August 20, 2009. (Tr. 34.) At the hearing, Isaac was represented by counsel, and a Vocational Expert testified. (Tr. 32-78.) On September 17, 2010, the ALJ issued a decision denying Isaac's application. (Tr. 13-21.) On October 13, 2010, Isaac filed a request for review with the Appeals Council. (Tr. 7-9.) The Appeals Council denied Isaac's request for review on April 12, 2012. (Tr. 1-6.) Thus, the ALJ's decision stood as the final decision of the Commissioner.

Issac filed a complaint in this Court on June 13, 2012. (Doc. 1.) Isaac also filed an application to proceed in forma pauperis (Doc. 2), which the Court granted (Doc. 3). After motions for extensions of time to file briefs were granted for both parties (Docs. 8, 11), supporting and opposing briefs were submitted (Docs. 10, 13), and the appeal[3] became ripe for disposition.

Isaac, who was born on February 5, 1976 (Tr. 75),[4] graduated from high school and then attended Penn State, Ogontz Campus, for one year, where she studied electrical engineering. (Tr. 36.) In the past, Isaac worked as a warehouse worker, categorized as a medium, unskilled position, and a laminating machine operator, categorized as a light, semi-skilled position usually

---

[3] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

[4] At the time of Isaac's alleged onset date of disability, Isaac was 32 years old, and is now 38 years old. Under the Social Security regulations, a person under the age of 50 is considered a "younger person." 20 CFR § 416.963(c). The Social Security Administration generally does not consider that a younger person's age will seriously affect a person's ability to adjust to other work. Id.

undertaken at a medium exertional level. (Tr. 72.)  Isaac has not worked since her alleged onset

date of disability, January 9, 2009.  (Tr. 36.)

Isaac states that she has mental health, knee and back issues. She has been under the care

of The Stevens Center and a therapist for mental health issues.  She has also undergone physical

therapy at the Drayer Physical Therapy Institute for knee and back pain.

For the reasons set forth below, we will affirm the decision of the Commissioner.

## II. STANDARD OF REVIEW

When considering a social security appeal, the Court has plenary review of all legal issues

decided by the Commissioner.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir.

2007); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  However, our review

of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether

those findings are supported by "substantial evidence." Id.  The factual findings of the

Commissioner, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §

405(g).  "Substantial evidence does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Johnson, 529 F.3d at 200 (3d Cir. 2008) (quoting Hartranft v. Apfel, 181 F.3d 358,

360 (3d Cir. 1999)) (internal quotations and citations omitted).  Substantial evidence has been

described as more than a mere scintilla of evidence but less than a preponderance.  Brown v.

Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  "It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427

(3d Cir. 1999) (citing Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)) (quoting Richardson

v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).  The Third Circuit Court of

Appeals has stated,

> [O]ur decisions make clear that determination of the existence *vel non* of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citing Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986)). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Id. (citing Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)).

## III. SEQUENTIAL EVALUATION PROCESS

The plaintiff must establish that there is some "medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." Fargnoli v. Massanari, 247 F.3d 34, 38-39 (3d Cir. 2001) (quoting Plummer, 186 F.3d at 427) (internal quotations omitted). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)). The Commissioner follows a five-step inquiry pursuant to 20 C.F.R. § 404.1520 to determine whether the claimant is disabled. In Plummer, the Third Circuit Court of Appeals set out the five-steps:

In step one, the Commissioner must determine whether the claimant is currently

4

engaging in substantial gainful activity. 20 C.F.R. § [404.]1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987) . . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Plummer, 186 F.3d at 428.

## IV. DISCUSSION

The ALJ went through each step of the sequential evaluation process and (1) found that

Isaac had not engaged in substantial gainful activity since January 9, 2009, the alleged onset date;

(2) found that Isaac had the severe impairments of bipolar disorder, generalized anxiety disorder,

and post-traumatic stress disorder ("PTSD"); (3) found that Isaac's impairments did not meet or

equal a listed impairment; (4) found that Isaac lacked credibility; and (5) concluded that Isaac

could not perform her past relevant work, but that she could perform medium work with several

limitations. (Tr.15-21.) Specifically, the ALJ found that the medium work had to be "limited in standing and walking more than 5 hours in an 8-hour workday." (Tr. 17.) The ALJ also found that Isaac "should avoid crouching, balancing or climbing[,] . . . can occasionally work around unprotected heights and pulmonary irritants[,] . . . requires low stress and only occasional changes in the work setting[,] and requires only occasional interaction with the general public, co-workers and supervisors." (Id.)

Isaac objects to the ALJ's findings in steps two and four of the sequential evaluation process. Therefore, we only discuss those steps in light of the parties' arguments.

## A. STEP TWO EVALUATION - SEVERE IMPAIRMENTS

The ALJ opined that after review of the objective and examination evidence, Isaac's "knee and back pain do not result in more than a minimal degree of limitation in the ability to perform basic work tasks, and are therefore considered to be not severe." (Tr. 16.) Isaac disagrees and argues that the medical evidence supports her complaints of pain in her knees and back. Isaac also argues that the ALJ did not adequately explain or cite to supportive evidence of why the degenerative joint disease in her knees was not severe.[5]

A "non-severe impairment" is "[a]n impairment or combination of impairments . . . [that] does not significantly limit [one's] physical or mental ability to do basic work activities."[6] 20 C.F.R. § 404.1521(a). Isaac bears the burden at step two to "demonstrate something beyond 'a

---

[5] Isaac characterizes her knee condition as "degenerative joint disease," but the Court does not find that diagnosis anywhere in the record, nor does Isaac cite to where in the record she was diagnosed with this condition.

[6] "Basic work activities" include, inter alia, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . ." Id. at § 404.1521(b)(1).

slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'" McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856, at *3) (citing Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue.")). Although Isaac's burden at step two is a "*de minimis* screening device to dispose of groundless claims," the Court must uphold the ALJ's findings at this stage if it is supported by substantial evidence. McCrea, 370 F.3d at 360.

If in his findings, the ALJ rejects pertinent or probative evidence, he must do so with an explanation. Johnson, 529 F.3d at 204 (citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981)). Section 404.1529 gives guidance as to how symptoms, including pain, are evaluated. It provides that statements about pain "will not alone establish [a disability]; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain . . . , when considered with all of the other evidence . . . ." 20 C.F.R. § 404.1529(a).

As the ALJ noted in his decision, the evidence of pain comes from Isaac's subjective complaints. There is no objective evidence in the record to establish a medical basis for those complaints as all x-rays of Isaac's knees were within normal limits.[7] In October 2009, Dr. Vandegriff completed a consultative examination and noted after examination and normal

---

[7] Dr. Oplinger stated in his letter to Dr. Hieb that "[o]n clinical and roentgenographic evaluation, the findings are that of low back pain and left knee patellofemoral pain." (Tr. 458.) There is no mention of the x-rays in Dr. Oplinger's office record as the "Physical Examination" section states that there is some pain with patellar compression but no joint line tenderness. (Tr. 459.)

lumbar x-rays, that there were no scars, erythema, swelling, or deformities of the lumbar spine, and that an evaluation of the spine and knee revealed disproportionate reaction and sensitivity to palpation than what would be expected. (Tr. 501.) Dr. Vandegriff also noted in his physical examination notes that Isaac had a normal stance and gait, she was able to get on and off the examination table without difficulty or assistance, she was able to bend over and pick up her daughter, and in the bent over position, place her daughter in a chair. (Id.)

In January 2010, Dr. Dailey, an orthopedic, diagnosed Isaac with left knee pain with probable patellofemoral lateral overload, but found there was no tenderness, swelling, ecchymosis, or deformity of the knee, no palpable effusion, the knee had full range of motion, and x-rays of both right and left knees showed that the bony structure was intact and there was no significant soft tissue abnormality. (Tr. 16, 543.) In Schmits v. Astrue, 386 F. App'x. 71 (3d Cir. 2010), the Third Circuit found that there was no medical basis for the claimant's knee pain when the only evidence was a diagnosis of post-traumatic chonodromalacia with associated pain and limited motion, when the only medical test was a normal x-ray. The Third Circuit stated that "[w]ithout a medical basis for those complaints, the ALJ was not required to give them great weight." Schmits, 386 F. App'x. at 73-74 (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999)). Similarly in this case, all x-rays were normal and the only evidence of pain came from Isaac's subjective complaints.

We find that substantial evidence supports the ALJ's finding that Isaac's knee and back pain are not severe, since the pain does not result in more than a minimal degree of limitation in

the ability to perform basic work tasks.[8]  We also find that the ALJ gave an adequate explanation

as he went through the objective medical evidence of each examination.  Even though Isaac was

diagnosed with patellofemoral pain, the ALJ had to examine the record for medical signs and

laboratory findings which show a medical impairment reasonably expected to produce that pain.

## B.  STEP FOUR EVALUATION - RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

### i.  Weight of Medical Opinions

The ALJ gave "significant weight" to the non-examining State Agency psychologist's

opinion (Tr. 505-08), "significant weight" to the treating physician's GAF scores of 60 and 65

(TR 377, 578), "little weight" to therapist, Bettye Anderson's opinion, and "appropriate weight"

to the consultative medical examiner's assessment of physical limitations (Tr. 495-504).  Isaac

asserts that the ALJ did not give appropriate weight and failed to set forth reasons for rejecting

the opinions of her treating psychiatrist, Dr. Wehman, therapist, Bettye Anderson, and consulting

psychological examiner, Dr. Klein.

The ALJ must consider all of the relevant evidence and give a clear explanation to

support his or her findings when determining the residual functional capacity.  Fargnoli, 247 F.3d

at 40, 41 (quoting Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)).  A

treating physician's opinion is entitled to controlling weight when it is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the claimant's] case record . . . ."  Johnson, 529 F.3d at 202

---

[8] We note that the ALJ did include Isaac's non-severe impairments in the subsequent steps of the sequential evaluation process in accordance with 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923, and 416.945(a)(2).  (Tr. 17-21.)  In determining Isaac's residual functional capacity, the ALJ included limitations related to Isaac's knee and back pain.  (Tr. 17.)

(quoting <u>Fargnoli</u>, 247 F.3d at 43 (quoting 20 C.F.R. § 404.1527(d)(2))) (internal quotations omitted). If a treating physician's opinion conflicts with an opinion of a non-treating physician, the ALJ may reject the treating physician's opinion "'only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." <u>Id</u>. (quoting <u>Plummer</u>, 186 F.3d at 429). The ALJ determines what weight to give a medical opinion by considering factors such as the examining relationship, the length of the treatment relationship and frequency of visits, nature and extent of the treatment relationship, whether the medical source supports the opinion with medical evidence, whether the opinion is consistent with the record as a whole, and the medical source's specialization. 20 C.F.R. § 404.1527(c)(1-5). If the ALJ discounts certain evidence, he must give some indication of the reasons for discounting that evidence. <u>Fargnoli</u>, 247 F.3d at 43.

Isaac's argument that the ALJ did not give the opinion of Isaac's treating physician, Dr. Wehman, appropriate weight appears to be based on Dr. Wehman's recommendation that Isaac continue to see therapist, Bettye Anderson, and that the ALJ gave little weight to Bettye Anderson's opinion. Isaac argues that the ALJ erred in not affording Bettye Anderson's opinion significant weight as an "other source" under 20 C.F.R. § 416.913. Isaac also argues that the ALJ erred in finding that the GAF scores assigned by Dr. Wehman were inconsistent with Bettye Anderson's assessment of "marked" restrictions.

The ALJ gave appropriate weight to Dr. Wehman's opinions. The ALJ discussed Dr. Wehman's opinions in his decision at length and noted that upon clinical examination in April 2009, Dr. Wehman noted that Isaac demonstrated "relevant and goal oriented speech, had normal range of affect, was in a stressed mood, had normal stream of thought, normal content of thought,

intact cognitive functions, and denied suicidal ideations and hallucinations." (Tr. 18.) Dr.

Wehman also consistently rated Isaac with a global assessment of functioning[9] ("GAF") scores of

60 and 65. (Tr. 18-19.) The ALJ relied on Dr. Wehman's clinical examinations and compared

the other opinions to Dr. Wehman's when determining what weight to give them.

The ALJ accorded Bettye Anderson's opinion little weight because he found that the

"marked" restrictions noted by Bettye Anderson were "overstated[,] . . . not supported by any

clinical examination[,]" and inconsistent with Isaac's treating physician's GAF scores and

findings that Isaac was doing well on her current medication regimen. (Tr. 19.) The ALJ pointed

out that the therapist's opinions were not supported by medical evidence and were inconsistent

with Isaac's treating physician's findings.

The only medical opinion from Bettye Anderson in the record is the Social Security

Administration's form, "Medical Source Statement of Ability to do Work-Related Activities

(Mental)." (Tr. 648-50.) The record does not contain any notes from Bettye Anderson's therapy

sessions with Isaac throughout the treatment history, but does contain a note discharging Isaac

from therapy treatment on December 3, 2008. (Tr. 457.)   The ALJ weighed the factors found in

Section 404.1527(c) and decided to give controlling weight to Dr. Wehman's findings, as he was

the treating physician.  Bettye Anderson opined that Isaac had "marked" restrictions in the ability

to make judgments on simple and complex work-related decisions, understand, remember and

carry out complex instructions, and respond appropriately to usual work situations and to changes

in a routine work setting. (Tr. 648-49.) There is substantial evidence to support the ALJ's

---

[9] "GAF scores are used by mental clinicians and doctors to rate the social, occupational, and psychological functioning of adults."  Irizarry v. Barnhart, 233 F App'x 189, 190 n. 1 (3d Cir. 2007).

determination to give Bettye Anderson's opinion little weight since the ALJ found her opinion inconsistent with the findings of Isaac's treating physician, which are given controlling weight, and because it was not substantiated by the record.

Isaac also argues that GAF scores assigned by Dr. Wehman "do not have a direct correlation to the severity requirements in the mental disorders listing." We agree, but since GAF scores are used by physicians to "rate the social, occupational, and psychological functioning of adults," then a GAF score incidentally "constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability." Joseph v. Astrue, No. 11-2668, 2012 WL 4459796, at *6 (E.D. Pa. April 26, 2012) (citing West v. Astrue, No. 09-2650, 2010 WL 1659712, at *4 (E.D. Pa. Apr. 26, 2010), Watson v. Astrue, No. 08-1858, 2009 WL 678717, at *5 (E.D.Pa. Mar. 13, 2009)).

The ALJ stated in his decision that the GAF scores of 60 and 65, given by Isaac's treating physician, were given "significant weight" since they were "consistent with the very limited clinical findings as well as the fact that the claimant's stress is mostly situational." (Tr. 19.) For example, when Dr. Wehman assigned a GAF score of 60 on April 28, 2009, he also noted that Isaac was stressed and that her Social Security claim was denied. (Tr. 380.) Dr. Wehman also gave Isaac a GAF score of 60 on April 22, 2010, and noted that she was evicted from a shelter where she was living with her children. (Tr. 579.) When seen other times, Dr. Wehman assigned GAF scores of 65 or 70 and noted that she was doing well on her medication. (Tr. 379, 382-84, 578, 580.) Therefore, we find that the ALJ properly considered the GAF scores as medical evidence, and there is substantial evidence to support the weight given to them.

12

Isaac also argues that the ALJ did not give appropriate weight to consulting psychological examiner, Dr. Klein, and failed to set forth the reasons for rejecting Dr. Klein's opinion. On October 1, 2009, Dr. Klein found that Isaac showed signs of PTSD, Bipolar and General Anxiety. (Tr. 488.) Dr. Klein also opined that it was not possible to determine how long it would take to stabilize those disorders at that time. (Id.)

The ALJ found that Dr. Klein's opinion of October 1, 2009, finding "marked" mental impairments in social functioning, of "little probative value" since they were "not supported by the examination findings at the time they were rendered and appear to be based on the claimant's allegations, which . . . are not entirely credible." (Tr. 19.) At that time, the examination findings of Isaac's treating phsyician were that Isaac was doing well on her medications. When there is conflicting medical findings, it is the ALJ's role to choose between them. See Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). As there was a conflict in the evidence, the ALJ gave greater weight to Isaac's treating physician's examination findings, which is entitled to controlling weight, and the state agency psychologist's findings.

Isaac argues that the ALJ erred in putting "significant weight" on the non-examining state agency psychologist's opinion, because the state agency psychologist rendered inconsistent opinions. We note that the opinions are not inconsistent with each other, as they assess Isaac over different periods of time. On October 23, 2009, the state agency psychologist completed a Mental Residual Capacity Assessment and a Psychiatric Review Technique. (Tr. 505-22.) The psychologist assessed Isaac to the "present," and found that Isaac had medically determinable impairments of PTSD, Bipolar Disorder and Generalized Anxiety Disorder (Tr. 512-14), and no more than moderate limitations in functioning (Tr. 505-08, 519). On October 28, 2009, the state

agency psychologist completed another Psychiatric Review Technique form that assessed Isaac to September 30, 2008. (Tr. 523-35.) The psychologist concluded that there was "insufficient evidence" to make a medical disposition on Isaac's psychiatric condition up until September 30, 2008. (Tr. 523.) Therefore, Isaac's argument that the state agency psychologist rendered inconsistent opinions is not accurate.

*ii. Duty to Develop the Record*

Isaac next argues that the ALJ should have recontacted her treating physician, Dr. Wehman, since the GAF scores above 50 created a conflict or ambiguity. Although the burden to develop the record lies with the claimant, the ALJ has the duty to attempt to obtain additional evidence "if the evidence before the Commissioner is insufficient . . . ." Money v. Barnhart, 91 F. App'x 210, 216 (3d Cir. 2004). "[T]he requirement for additional information is triggered only when the evidence from the treating medical source is inadequate to make a determination as to the claimant's disability." Johnson, 529 F.3d at 205 (quoting Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002)).

The ALJ had the medical records from Isaac's treating physician, ordered a consultative examination, and received a state agency expert's RFC assessment. See Carmichael v. Barnhart, 104 F. App'x 803, 805 (3d Cir. 2004); see also Freeman v. Comm'r of Soc. Sec., No. 3:13-CV-00065, 2014 WL 1293865, at *13 (M.D. Pa. Mar. 31, 2014). We find that the ALJ adequately developed the record, and that the GAF scores did not create a conflict or ambiguity.[10]

---

[10] A GAF score of 60 "is on the borderline between moderate and mild symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 814 n. 5 (E.D. Pa. 2006) (citing American Psychiatric Association, Diagnostic and Statistical Manual 32, at 34 (4th ed. 2000)) ("DSM-IV"). "A score of 61 - 70 is indicative of 'some mild symptoms' (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well, has some

### iii. Credibility of Claimant

The ALJ found that Isaac's statements concerning the intensity, persistence and limiting effects of her mental health symptoms were not credible to the extent that they were inconsistent with the ALJ's residual functional capacity assessment. Isaac argues that since she submitted sufficient evidence, the ALJ may not dismiss her testimony as not credible without pointing to contrary medical evidence.

Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p at 3.

Regarding a claimant's subjective complaints, "a reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness." Izzo v. Comm'r of Soc. Sec., 186 F. App'x 280, 286 (3d Cir. 2006) (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999)). The Court is to defer to the ALJ as trier of fact, "the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of Health & Human Services, 933 F.2d 799, 801 (10th Cir. 1991).

In the instant case, the Court finds that the ALJ's decision regarding Isaac's credibility is

---

meaningful interpersonal relationship." Id.

supported by substantial evidence.  The ALJ stated that Isaac "lacked credibility when she alleged long-time abstinence from drugs and alcohol, and later told the [ALJ] upon cross-examination that references in physical therapy record to being 'hung over' refer to the effects of prescribed medication."  (Tr. 19.)  This is in conjunction with Isaac's denial of any medication-induced side effects.  (Id.)  The ALJ also noted for the record that Isaac "spent time in jail for misusing a daughter's public assistance benefit card."  (Id.)  The ALJ further evidenced his credibility determination by noting that Isaac's complaints about her back and knee during a consultative examination were found to be "disproportionate" to the medical evidence presented at the exam.  (Tr. 19; 501.)

Isaac also testified at the hearing that she "spends most of her day lying around while her husband cares for her children and performs most of the household chores."  (Tr. 18.)  Conversely, she testified that she cares for her children all the time, and has to take the kids shopping since her husband will not care for all of them when she leaves the house.  (Tr. 58-59.)  The Court sees no reason to deviate from the general rule that compels us to defer to the ALJ's determination of Isaac's credibility as, "there is sufficient basis for the ALJ's decision to discredit" Isaac, and the ALJ pointed to contrary medical evidence to support his finding. Izzo, 186 F. App'x at 286.

## V. CONCLUSION

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C.  § 405(g) affirm the decision of the Commissioner.